ORIGINAL

U. S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

DEC 1 7 1999

NANCY DOHERTY, CLERK

By _____
Deputy

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VADIM KISILENKO and JAY AND BESS RAKOW, as Trustees of THE RAKOW FAMILY TRUST, On Behalf of Themselves and All Others Similarly Situated, | ) ) ) ) ) | No. **3 - 9 9 C V 2 8 7 2 - D** <br><br> **COMPLAINT - CLASS ACTION** <br><br> COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934 |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| 3DFX INTERACTIVE, INC., Successor-in-Interest to STB SYSTEMS, INC., WILLIAM E. OGLE, RANDALL D. EISENBACH and JAMES L. HOPKINS, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | **DEMAND FOR JURY TRIAL** |

## INTRODUCTION AND OVERVIEW

1.     This is a securities fraud class action on behalf of all persons who purchased the common stock of STB Systems, Inc. ("STB" or the "Company") between August 25, 1997 and May 1, 1998, inclusive (the "Class Period"). STB manufactured and sold multimedia systems and specialized technology products, primarily for use in personal computers. In May 1999 STB was acquired by 3Dfx Interactive, Inc.

2.     This action complains of a scheme and wrongful course of business which was designed to and did operate as a fraud and deceit on purchasers of STB stock. Pursuant to defendants' common scheme and wrongful course of business, defendants knowingly made false and misleading statements about the demand for and success of STB's products while concealing the fact that because of ongoing quality problems with STB products, two of STB's largest customers had informed defendants that they were no longer willing to accept and/or pay for shipments of defective STB products.

3.     In an attempt to raise badly needed cash for STB and sell some of their own STB shares via a public offering, defendants attempted to conceal these problems, and falsely represented that STB was generating "record" performance, based in large part upon the "particularly strong paced" results of STB's Specialized Technology Group and the "phenomenal success" of the Velocity 128 graphics accelerator which ensured that STB would post strong earnings per share ("EPS") growth during FY97-FY98. These false statements were designed to and did allow STB stock to continue to trade at artificially inflated levels as high as $30-1/2 per share, and allowed defendants to complete the sale of $66 million of STB stock at dramatically inflated levels.[1]

4.     Beginning in the second half of April 1998, STB's problems were revealed to the public. First, two of its major OEM customers (Compaq and Dell) announced that their new generation of products would not contain any STB boards. Further, one of STB's competitors, which had won the contract with Compaq, announced that it had begun shipping a video board using SDRAM technology that worked faster and cost substantially less than STB's products. This news

---

[1]     All share and per-share figures herein have been adjusted to reflect STB's February 1998 3-for-2 split.

began to depress STB's stock price, causing it to drop from $19-3/4 to $14-5/16 between April 14, 1998 and April 30, 1998.

5.     Then, on May 1, 1998 – *just five weeks after defendants had sold $66 million of STB shares at $22 per share* – the price of STB shares plummeted to just $10-7/8 per share as defendants revealed that, contrary to their prior representations, certain of STB's large OEM customers were delaying purchases and that STB's gross margins had been ravaged. Defendants' revelations devastated the price of STB stock, and as investors came to appreciate the poor condition of STB's operations, the price of STB dropped to less than $6 per share.

6.     The positive statements made by defendants during the Class Period about STB's business, the quality and demand for its products and STB's earnings prospects were each false and misleading when made. The true facts, which were then actually known to defendants but which defendants intentionally concealed, were:

(a)     Despite the adverse test results obtained by STB and provided by STB's quality director to the defendants prior to August 25, 1997, which showed the defects in the Velocity 128, STB represented to its OEM customers that the test results showed favorable performance results.

(b)     STB was not providing its customers or end users with quality products which provided "exceptional" or "superior" performance, as the Velocity 128 multimedia accelerator was being shipped despite the defects which were known to defendants.

(c)     A material part of STB's production constraints were due to the inability of STB supplier nVIDIA to supply substantial amounts of operable Real-time Interactive Video & Animation ("RIVA") 128 chips.

(d)     STB's cost of sales had increased during 4Q97 in material part due to returns of defective Velocity 128 cards.

(e)     The Velocity 128 had not been successfully introduced, but rather was suffering from the crippling defects which caused computers in which the defective Velocity 128 was installed to crash.

- 2 -

(f)     STB had *not* experienced strong market acceptance of the Velocity 128 and demand was *not* growing as certain OEM customers, including Dell, had switched to sourcing their graphics cards from STB's competitors, including ATI Technologies, because of the design defects and quality problems with STB products.

(g)     A substantial portion of the nVIDIA RIVA 128 chips used to power the Velocity 128 and STB's other workstation graphics products were defective, which problem could not be overcome, and thus STB was not capable of achieving the FY98 EPS numbers disseminated by defendants.

(h)     STB was manufacturing and selling to its largest and most important OEM customers large numbers of defective products in a desperate attempt to meet demand, which practice resulted in the return of substantial amounts of product and sky-rocketing customer dissatisfaction.

(i)     As a result of the foregoing, defendants knew their forecasts that STB would achieve FY97 EPS of $0.96-$0.98 and FY98 EPS of $1.29-$1.36 were false, as such EPS were impossible to achieve in light of these undisclosed problems.

(j)     These forecasts of FY97 and FY98 EPS were false and were known to be false by defendants, as they were aware of the adverse information set forth above which contradicted these forecasts and made them unattainable.

7.     The chart below shows the price increase in STB stock while defendants were issuing their false and misleading statements about the Company, and the subsequent collapse as the adverse facts were disclosed:



**STB Systems, Inc.**
**June 30, 1997 - December 10, 1998**
**Daily Stock Prices**

## JURISDICTION AND VENUE

8.    The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

9.    Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

10.    Venue is proper in this District pursuant to §27 of the Exchange Act, and 28 U.S.C. §1391(b).  Certain of the acts and transactions giving rise to the violations of law complained of occurred in this District.

## THE PARTIES

11.    (a)    Plaintiff Vadim Kisilenko purchased shares of STB common stock during the Class Period as detailed in the attached certification and was damaged thereby.

- 4 -

(b)     Plaintiff Jay and Bess Rakow as Trustees of The Rakow Family Trust, purchased shares of STB common stock during the Class Period as detailed in the attached certification and was damaged thereby.

12.     STB maintained its headquarters in Dallas, Texas.  During the Class Period, STB's common stock traded in an efficient market on the NASDAQ National Market System.  Defendant 3Dfx Interactive, Inc. is the successor-in-interest to STB.

13.     (a)     At all relevant times, defendant William E. Ogle ("Ogle") was Chairman of the Board, Chief Executive Officer and President of the Company.  Defendant Ogle is a co-founder of the Company and because of Ogle's positions with the Company he knew or recklessly disregarded the adverse information detailed herein, as he had access to the adverse non-public information about its business and present business prospects via access to internal corporate documents (including the Company's operating plan, budget and forecasts), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Class Period, Ogle sold 75,000 shares of STB stock for proceeds of more than $1.5 million.

(b)     At all relevant times, defendant James L. Hopkins ("Hopkins") was Vice President of Strategic Marketing, Chief Financial Officer and a director of the Company.  Hopkins' responsibilities included STB's specialized technology products.  Because of Hopkins' positions with the Company he knew or recklessly disregarded the adverse information detailed herein, as he had access to the adverse non-public information about STB's business, finances, products and present and future business prospects via access to internal corporate documents (including the Company's operating plan and forecasts), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.

(c)     At all relevant times, defendant Randall D. Eisenbach ("Eisenbach") was Executive Vice President, Chief Operating Officer and a director of the Company.  Because of Eisenbach's position with the Company he knew or recklessly disregarded the adverse information

- 5 -

detailed herein, as he had access to the adverse non-public information about STB's business, finances, products and present and future business prospects via access to internal corporate documents (including the Company's operating plan and forecasts), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Class Period Eisenbach sold 27,447 shares of STB stock for proceeds of over $740,000.

14. Ogle, by reason of his stock ownership, management position, and membership on STB's Board, was a controlling person of STB and had the power and influence, and exercised the same, to cause it to engage in the illegal conduct complained of herein.

15. The individuals named as defendants in ¶13(a)-(c) are referred to herein as the "Individual Defendants." The Individual Defendants are liable for the false statements made in STB's corporate releases, SEC filings and public reports, as those statements were each "group-published" information, the result of the collective action of the Individual Defendants. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the power and authority to control the contents of its quarterly and annual reports, press releases and presentations to securities analysts, which information was conveyed through the analysts to the investing public. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

**DEFENDANTS' SCIENTER**

16. In addition to having actual knowledge of the falsity of their statements, each of the defendants had the motive and the opportunity to perpetrate the fraudulent scheme and course of business described herein.

17. Furthermore, by FY97, STB had utilized most of its line of credit, had little cash and was facing substantial quality and customer satisfaction problems. Thus, in order to attempt to conceal its rapidly declining competitive position and raise tens of millions of dollars for STB via a public offering, defendants fostered the perception in the business community that STB remained a technological leader and that its products, including the Velocity 128 multimedia accelerator, were experiencing strong demand from STB's OEM customers, thereby ensuring that STB stock would continue to trade at substantially inflated prices which defendants knew would allow them to sell STB shares to the public at prices which would not dilute STB's FY98 EPS.

18. Simply put, defendants' motive to engage in the conduct complained of included a desire to inflate the price of STB's stock in order to: (i) enhance the value of their holdings of STB stock and/or options to purchase STB stock; (ii) obtain larger payments under the Company's executive bonus compensation plan and/or via discretionary individual performance bonuses; and (iii) allow defendants to sell millions of STB shares to the public *prior to disclosing* the truth about the deferral of orders by STB's largest OEM customers (including Dell and Compaq) because of quality issues which defendants knew would cause the price of STB shares to plummet.

19. During the Class Period, each Individual Defendant occupied a position that made him privy to non-public information concerning STB. Because of this access, each of these defendants knew the adverse facts specified herein that were being concealed. STB's press releases, corporate reports to shareholders, and filings with the SEC were all group-published documents for which each defendant is equally responsible.

### BACKGROUND TO THE CLASS PERIOD

20. By early 1997, STB was falling behind competitors, including ATI Technologies, in the development of low-priced graphics boards. In order to continue to obtain design wins, STB promised potential customers delivery of technology the Company had not yet developed. By mid-1997, STB's practice of over-promising customers was coming off the tracks, as in June 1997, Sony canceled a large contract with STB due to its failure to deliver on promised technology. Defendants knew that STB's future growth was dependant upon the successful introduction of a new generation of multimedia accelerators, including STB's newest multimedia accelerator, the Velocity 128, which

- 7 -

was based on the RIVA 128 graphics engine manufactured by nVIDIA. In June 1997, STB began extensive testing of the Velocity 128. By the beginning of the Class Period, the defendants reviewed the results of performance tests conducted on the Velocity 128 which proved that the nVIDIA RIVA 128 graphics engine which formed the core around which STB had designed and built the Velocity 128 was defective and was causing PC's in which it was installed to crash.

21.    Because the Velocity 128 was designed around the RIVA 128, the defendants were caught between the proverbial rock and a hard place as STB was not able to immediately shift to alternative sources to obtain compatible alternative components and the defendants knew that if STB admitted the problem to customers and the public, its earnings and its stock price would suffer accordingly. In an effort to continue to obtain design wins from its customers, including its largest OEM customers, defendants concealed the massive problems STB was having with its cutting edge products. Essentially, in an effort to convince the market of STB's technological prowess and superior technology, defendants embarked upon the scheme and wrongful course of business complained of herein.

## FALSE AND MISLEADING STATEMENTS ISSUED
## BY DEFENDANTS DURING THE CLASS PERIOD

22.    On August 25, 1997, STB issued several releases, including:

(a)    A release containing its results for 3Q97. The release stated:

For the quarter ended July 31, 1997, net income was $2.47 million or [$.22] per share on net sales of $42.0 million compared to net income of $1.38 million or [$.13] per share on net sales of $42.5 million for the third quarter of fiscal 1996. There were [11.25] million average shares outstanding for the fiscal 1997 third quarter, compared to [10.35] million equivalent average shares for the same quarter of fiscal 1996 (as adjusted for the company's stock dividend in the third quarter).

Third quarter fiscal 1997 net income of $2.47 million increased $1.09 million or 79% over the third quarter 1996 net income of $1.38 million. Net revenues of $42.0 million for the quarter were down from $48.7 million in the preceding quarter due primarily to reductions in average unit selling prices, which were brought on by price competition in the retail/commercial channel, increased unit shipments of the company's lower priced OEM products and shipments of a low-cost wavetable audio product. Unit volumes increased, rising 28% through the first three quarters of fiscal 1997 compared to the same period for fiscal 1996 and up 22% over the same quarter of fiscal 1996.

"*We are pleased to report our seventh consecutive quarter of record profit,*" said William E. Ogle, STB's Chairman and Chief Executive Officer. "*We were able to overcome seasonal weakness in the market and some pricing pressures in the*

- 8 -

*commercial channel to have another successful quarter. Sales into our Specialized Technology Group were particularly strong paced by the launch of a new OEM workstation program," Ogle added.*

*"Sales by STB's Specialized Technology Group set another record for the quarter* resulting from shipments to several major OEM's for their workstation groups along with strong demand from news service and international banking customers," said Jim Hopkins, STB's Vice President of Strategic Marketing and Chief Financial Officer. "We also introduced the Galileo flat panel display product which was well received at the Securities Industry Association tradeshow in New York," added Hopkins.

The gross profit margin for the quarter improved to 29.6% compared to 20.3% posted during the third quarter of fiscal 1996, and up from the 24.2% achieved during the previous quarter. The improvement in operating performance for the third quarter over the same quarter a year ago was attributable to several factors including increased sales and margins in the Specialized Technology Group, offset by sales of lower margin OEM products and pricing pressures in the retail/commercial channel.

    (b)    A release announcing that computer manufacturer Gateway 2000 had selected STB's Velocity 128 multimedia accelerator as the graphics accelerator for Gateway's latest multimedia PC offering. The release stated:

STB Systems, Inc., ... a leading supplier of multimedia subsystem products to the OEM community, announced that one of the industry's premier PC manufacturers, Gateway 2000, has selected STB's new Velocity 128 multimedia accelerator as the AGP graphics accelerator in Gateway's latest G-series multimedia systems.

The Velocity 128 will be standard equipment in Gateway's G-266 and G-300XL multimedia systems.

STB's new Velocity 128 delivers pure 128-bit multimedia acceleration with full-speed polygon setup and pixel rendering for both PCI and Accelerated Graphics Port (AGP) based systems. *The Velocity 128 combines superior 3-D performance with exceptional 2-D graphics and video quality.* Available with 4MB of high-speed SGRAM video memory, this new accelerator incorporates a 230Mhz RAMDAC supporting flicker-free refresh rates up to 160Hz.

Powered by the RIVA (Real-time Interactive Video & Animation) 128 graphics engine from NVIDIA, the Velocity 128 provides high-performance graphics, full-speed MPEG 2 playback, optimized Direct-X gaming and entertainment, the bandwidth needed to explore emerging Internet virtual worlds, and high-end API support for CAD and visualization applications using OpenGL for NT 4.0.

"The Velocity 128 outperforms other multimedia accelerators in both benchmark scores and in real-world applications. Gateway 2000's use of this technology should serve as a testament to its commitment to providing its customers with the high-performance systems," said J. Shane Long, STB's vice president of sales and marketing.

*   *   *

- 9 -

Simply the Best!

\* \* \*

Manufacturing strength, engineering expertise and consistent quality make STB the leading supplier of multimedia accelerators to top-tier PC manufacturers. STB's products can be found in systems from Acer, Compaq, Dell, Gateway 2000 and IBM. STB recently acquired Symmetric Simulation Systems Inc., a leader in the professional-class 3-D graphics market, which is operated as a wholly owned subsidiary.

        (c)    A release announcing that Dell would also be incorporating the Velocity 128

into several of its computer lines. The release stated:

STB Systems, ... a leading supplier of multimedia subsystem products to the OEM community, announced a major design win for its new Velocity 128 AGP multimedia accelerator.

The STB Velocity 128 will be incorporated into systems from Dell Computer Corp. The Velocity 128 will be standard equipment on selected systems in the Dell Dimensions line and offered as an upgrade option on other systems.

The Velocity 128 combines a true 128-bit multimedia engine with 4MB of 128-bit SGRAM memory for maximum bandwidth and performance. *STB has also incorporated a number of unique optimizations into its software driver to push the performance of the Velocity 128 ahead of competing multimedia accelerators in benchmark tests and real-world applications*.

Using PC Magazine's 3D Winbench 97 on a Pentium 2-266 with MMX technology, the Velocity 128 PCI broke the 200 3D Winmark barrier and posted a score of 230 (a).

*"STB is bringing a technology to market that is far superior to anything that is available now or in the near future. Dell's customers can look forward to 2-D, 3-D and live-action video performance that was previously unavailable from a single card solution,"* said J. Shane Long, STB's vice president of sales and marketing.

Based on the NVIDIA RIVA 128, the Velocity 128 supports many advanced 3-D rendering features for great detail and richer special effects for more realistic gaming. The Velocity 128 has the capabilities to output a display to a computer monitor or a standard television via S-video or composite connectors and is MPEG-2-compatible to support DVD data streams.

        23.    On August 25, 1997, in connection with the release of STB's 3Q97 results, defendants

Ogle, Eisenbach and Hopkins arranged a nationwide conference call for securities analysts, large

STB shareholders, brokers, stock traders and hedge fund managers. During the conference call and

during follow-up one-on-one conversations, defendants directly disseminated important information

to the market by stating:

- 10 -

- STB was in the process of ramping up production to meet improving OEM backlog.

- STB had obtained a new design win at Dell for an nVIDIA-based Board.

- Increasing revenue (due to record OEM backlog) combined with *slightly declining* gross margins would produce "record" EPS results in 4Q97 and into FY98.

- Based upon continued strong demand for STB's high-end graphics products STB would post FY97 and FY98 EPS of $0.96-$0.98 and $1.30-$1.36, respectively.

24.     During the first two weeks of September 1997, defendants Ogle and Hopkins had numerous conversations with securities analysts, including Lenny Brecken of Hambrecht & Quist, in an attempt to get them to initiate coverage (*i.e.*, issue extremely positive "research" reports about STB and its prospects) and/or upgrade their ratings on STB stock to a "Buy." As part of their effort to foment interest in STB shares, defendants represented:

- Beginning in August, STB sales, including sales to Dell, had accelerated.

- STB's strong sales of graphics adapters to Dell and Compaq would drive STB's FY97 and FY98 EPS.

- STB was gaining strength with its OEM customers in large part because of its reputation as a quality supplier of graphics products.

- STB would post FY97 and FY98 EPS of $0.96 and $1.30-$1.32, respectfully.

25.     After the conference call and follow-up conversations described in ¶¶23-24, several investment firms issued reports on STB in which the firms rated STB and forecast its earnings based on and repeating the statements defendants made to analysts.

26.     On August 27 and September 17, 1997, defendant Eisenbach sold STB stock reaping over $740,000.

27.     The statements made by defendants as detailed in ¶¶22-24, were each false and misleading when made. The true facts, which were then known to each of the defendants based upon their access to and review of confidential internal STB data, were:

(a)     STB's "successful" and "record" quarter was nothing short of a ruse, as each of the defendants had been aware for at least two months that STB was shipping defective nVIDIA-based cards to its OEM customers, including Dell.

- 11 -

(b) STB's quality director had provided to the defendants extensive test results which showed significant defects in the Velocity 128 which, when installed in PC's, would cause them to crash.

(c) STB had told to its OEM customers that the test results for the Velocity 128 showed favorable performance results.

(d) STB was not providing its customers or end users with "exceptional" or "superior" performance or quality products as the Velocity 128 multimedia accelerator was being shipped despite the defects which were known to defendants.

(e) Because of (a)-(d) above, defendants knew that STB's sales could not continue and would result in massive returns and/or substantial additional costs to STB as Dell and STB's other OEM customers became aware of the fact that STB had been selling defective products to them.

(f) Based on (a)-(e) above, *defendants knew that* STB sales to its OEM customers would not drive FY97 and FY98 results, and that it was impossible for STB to meet FY97 and FY98 EPS expectations given the defects with the Velocity 128.

(g) Because of (a)-(f) above, defendants' claims that STB products provided "consistent quality" and that its products provided "maximum" software performance were false and misleading when made.

(h) As a result of the foregoing, defendants knew their forecasts that STB would achieve FY97 EPS of $0.96-$0.98 and FY98 EPS of $1.30-$1.36 were false, as such EPS were impossible to achieve in light of these undisclosed problems.

(i) These forecasts of FY97 and FY98 EPS were false and were known to be false by defendants, as they were aware of the adverse information set forth above which contradicted these forecasts and made them unattainable.

28. In October 1997, the price of STB shares began to erode as rumors swirled that Dell had delayed and/or cancelled orders from STB. In order to reverse the decline in the price of STB stock, defendants Ogle and Hopkins, together with STB's Investor Relations employee Brian Burke,

represented to investors and securities analysts, including Tim Kellis of Rausher Pierce and Lenny Bracken of Oppenheimer that:

- STB was not experiencing any problems in its relationship with Dell.

- Dell was not canceling orders or shifting graphics business away from STB to other vendors.

- The only constraint on STB's sale of graphics cards to Dell was the limited availability of nVIDIA chips.

- STB remained on track to post FY97 and FY98 EPS of $0.96-$0.98 and $1.30-$1.35.

29.     Defendants' efforts to reinflate the price of STB shares were successful and they were briefly able to stabilize the price of STB stock at $19 per share.

30.     On December 8, 1997, STB issued a release reporting "***Record Financial Results for the Fourth Quarter and the 1997 Fiscal Year***."  The release stated:

> For the fiscal 1997 fourth quarter which ended October 31, 1997, net income was a record $3.6 million or [$.31] per common share on net sales of $60.7 million compared to net income of $2.1 million or [$.20] per common share on net sales of $48.1 million for the fourth quarter of fiscal 1996.

> \*    \*    \*

> The gross profit margin for the quarter was 25.1%, compared to the 22.9% posted during the fourth quarter of fiscal 1996 and the 29.6% achieved during the previous quarter.  The increase in overall gross profit margin for the fourth quarter of 1997 compared to the fourth quarter of 1996 was primarily attributable to increased sales to the specialized technology channel.  The reduction in overall gross profit margin for the fourth quarter of 1997 compared to the preceding quarter was attributable to increased sales to the OEM channel and reduced sales to the specialized technology channel offset by increased sales to the commercial channel.

> \*    \*    \*

> "***We are not only enjoying our eighth consecutive quarter of record profits, but record revenues and profits for the year as well***" said William E. Ogle, STB's Chairman and Chief Executive.  "***We were able to successfully launch the award winning Velocity 128 and smoothly transition into our new manufacturing facility which includes the addition of two new manufacturing lines***.  The move and the new equipment increase our production capacity moving into the 1998 fiscal year."

> \*    \*    \*

> The Nitro 3D product which was introduced previously continued to be well received in both the retail and distribution customer base.  "***We are very pleased with results from the introduction of the Velocity 128 which has enjoyed phenomenal success in the market place and in magazine reviews***," said J. Shane Long, STB's Vice President of Sales and Marketing.

- 13 -

"*Sales by STB's Specialized Technology Group continued its earlier success with shipments to several major OEM's for their workstation groups,*" said Jim Hopkins, STB's Vice President of Strategic Marketing and Chief Financial Officer.

31.     On December 8, 1997, in connection with the release of STB's 4Q97 results, defendants Ogle and Hopkins arranged a nationwide conference call for securities analysts, large STB shareholders, brokers, stock traders and hedge fund managers.  During the conference call and in follow-up one-on-one conversations, defendants directly disseminated important information to the market by stating:

•       STB was experiencing strong market acceptance of its new graphics products and demand from its OEM customers, including Dell, was continuing to grow.

•       The strength of STB's non-cancelable backlog ensured continued strong performance for STB through FY98.

•       STB's posting of slightly lower-than-expected revenues were simply the result of a shortage of nVIDIA chips.

•       STB had been able to deflect significant pricing pressure and therefore been able to post better-than-expected gross margins of 25.2%.

•       The slight increase in STB's accounts receivable was the result of a late shipment of nVIDIA-based cards.

•       STB remained on track to post FY98 EPS of $1.29+.

32.     After the conference call and follow-up conversations described in ¶¶28 and 31, several investment firms issued reports on STB in which the firms rated STB and forecast its earnings based on and repeating the statements defendants made to analysts.

33.     The statements made by defendants, as detailed in ¶¶28 and 30-31, were each false and misleading when made.  The true facts, which were then known to each of the defendants based upon their access to and review of confidential internal STB data, were:

        (a)     In fact, there was a fundamental problem with STB's relationship with Dell, as Dell had threatened to terminate its relationship with STB, which termination was avoided only by STB's agreement that it would: (i) offer substantial discounts on Dell's purchases of the Velocity 128 and other products in exchange for Dell agreeing to continue to purchase product from STB; and (ii) fire the quality director responsible for the Velocity 128.

- 14 -

(b)     STB's production constraints were due, in part, to the inability of nVIDIA to supply substantial amounts of operable RIVA 128 chips.

(c)     STB's backlog was not firm as STB's customers, including Compaq, had evaluations and cancellation rights and much of the backlog was likely to be cancelled due to STB's quality problems.

(d)     STB's cost of sales had increased during 4Q97 in material part due to returns of defective Velocity 128 cards.

(e)     The Velocity 128 had not been successfully introduced, but rather was suffering from the crippling defects which caused computers in which the defective Velocity 128 was installed to crash.

(f)     STB had *not* experienced strong market acceptance of the Velocity 128 and demand was *not* growing, as certain OEM customers, including Dell, had begun to source their graphics cards from STB's competitors, including ATI Technologies, because of the design defects and quality problems with STB products.

(g)     STB's lower-than-expected 4Q97 revenue and increased accounts receivable were due, in material part, to an unwillingness of Dell to accept and/or pay for defective STB product.

(h)     As a result of the foregoing, defendants knew their forecasts that STB would achieve FY98 EPS of $1.29-$1.35 were false, as such EPS were impossible to achieve in light of these undisclosed problems.

(i)     These forecasts of FY97 and FY98 EPS were false and were known to be false by defendants, as they were aware of the adverse information set forth above which contradicted these forecasts and made them unattainable.

34.     On or about January 29, 1998, defendants filed with the SEC STB's 1997 report on Form 10-K ("1997 10-K"):

(a)     The 1997 10-K emphasized the "close relationships" STB had with its OEM customers, stating that "close relationships" with many of its OEM customers caused STB to

- 15 -

"believe[ ] that the strength of these relationships also places it in a strong position to be the provider of choice to OEMs."

        (b)    The 1997 10-K also noted the Company's high quality standards, stating:

> The Company emphasizes a comprehensive quality control program at each step in the manufacturing process. The manufacturing process involves both automated and manual placement and soldering of components on the circuit board. After final assembly is completed, each product unit undergoes an elevated temperature burn-in, a process simulating a PC environment in which the product is placed in an oven and connected to an electrical source for several hours. After each product has been burned-in, it is placed through a series of diagnostic tests to detect defects. ***The Company believes its comprehensive testing procedures significantly contribute to its ability to satisfy its customers' stringent product performance and reliability requirements***. The Company offers a limited warranty ranging from 15 to 39 months for products sold to OEMs, a five-year limited warranty on its specialized technology products and a limited lifetime warranty on products sold to commercial customers.

        (c)    Finally, the 1997 10-K noted the strength of the Company's relationships with its OEM customers which comprised 79% of STB's FY97 revenue, stating:

> The Company's goal is to become the leading supplier of multimedia accelerators and certain other multimedia subsystems for PCs. The Company's focus on the design, manufacture and sale of multimedia accelerators has earned it a reputation for providing advanced graphics display solutions. With its size and reputation, the Company has built relationships with chip suppliers that allow it to obtain advance information about new developments in video controller chip technology. ***Additionally, close relationships with many of its OEM customers better enable the Company to determine what future performance features are most desired. The Company believes that the strength of these relationships also places it in a strong position to be the provider of a choice to OEMs for a number of other multimedia subsystem products***. STB believes that it is positioned to compete effectively by using its knowledge of technological advances and customer desires, together with its own value-added development of software drivers and utilities, to provide high-quality multimedia accelerators and other multimedia subsystems to the PC marketplace on a timely, cost-effective basis. The Company also seeks to take advantage of its expertise gained in developing multimedia subsystem products to develop its specialized technology products.

*   *   *

> CONTINUED FOCUS ON OEM SALES CHANNEL. The Company has continued to focus on the OEM sales channel, as evidenced by a significant increase in sales within this channel during the 1997 fiscal year, and the fact that approximately 79% of the Company's revenues during such period were derived from sales to OEMs. ***The expansion of the Company's business with several established OEM customers, such as Gateway 2000, Dell Computer, Compaq Computer and IBM, demonstrate the success of the Company's commitment to meeting the needs of OEMs***. Historically, the Company has provided OEMs with mid-range multimedia accelerators. The Company recently has commenced delivery of high-end multimedia accelerators and other multimedia subsystem products in an effort to expand its product offerings to the OEM market.

- 16 -

35. On February 5, 1998, STB announced that its Board of Directors had approved a 3-for-2 stock split to shareholders of record on February 11, 1998.

36. On February 23, 1998, STB issued a release reporting "*Record*" results for 1Q98. The release announced that STB would be conducting a 3 million share public offering and stated:

For the quarter ended January 31, 1998, net income was $3.8 million or $.33 diluted net income per share on net sales of $78.8 million compared to net income of $2.3 million or $.21 diluted net income per share on net sales of $48.1 million for the first quarter of fiscal 1997. There were 11.4 million diluted weighted average shares outstanding for the fiscal 1998 first quarter, compared to 10.7 million diluted weighted average shares for same quarter of fiscal 1997.

*For the quarter, OEM channel sales were particularly strong as shipments to the Company's two largest customers exceeded customer forecasts. In high demand was the Company's award-winning, nVidia based, Velocity 128 graphics accelerator.*

\* \* \*

The gross profit margin for the quarter was 20.6% compared to 22.1% posted during the first quarter of fiscal 1997, and down from the 25.1% achieved during the previous quarter. The reduction in gross profit margin for the first quarter compared to the same quarter a year ago was primarily attributable to increased overall OEM unit volumes, offset by modest increases in channel sales and relatively level specialized technology sales. The gross profit margin was also impacted as a result of premium prices paid for SGRAM on the spot market and added factory labor costs to meet above forecasted demands by our customer base. When compared to the previous quarter, the gross profit margin declined due to lower levels of sales to the OEM channel in that quarter.

"*We are pleased to report our ninth consecutive quarter of record profit,*" said William E. Ogle, STB's Chairman and Chief Executive Officer. "We were able to meet our OEM customers upside demands on short notice for our products. *The recognition by the marketplace of STB's award-winning Velocity 128 product has also been particularly gratifying,*" Ogle added.

The Company's commercial channel revenues increased modestly over 4th quarter of 1997, but down slightly from the same quarter of fiscal 1997. *Although channel demand was strong, shipments were below expectations due to limited controller chip availability resulting from the unexpected OEM upside demand.*

Revenues from the Specialized Technology Group increased by 53% over the same quarter of fiscal 1997, although flat with the preceding quarter. During the quarter, the Company successfully launched the first production units of the Galileo flat panel display systems. *In addition, the MVP product line for workstations also performed well.*

37. On February 23, 1998, in connection with the release of STB's results for the quarter and year ended October 31, 1997, and the announcement of STB's planned 3 million share offering, defendants Ogle and Hopkins arranged a nationwide conference call from STB's headquarters for

securities analysts, large STB shareholders, brokers and stock traders. During the conference call and in subsequent one-on-one conversations, defendants directly disseminated important information to the market by stating:

- STB would beat "*analysts*" split-adjusted FY98 EPS estimates of $1.33.

- STB's gross margins were increasing and would continue to increase during the remainder of FY98.

- STB was continuing to see strong OEM demand for its add-in cards.

- Demand from Dell for the Velocity 128 remained strong.

- STB's non-OEM demand exceeded expectations by 20%.

- Margins would remain stable in 2Q98 as the effect of declining PC prices would be more than offset by continuing strong demand.

- STB would complete a follow-up offering of 3 million shares, including an initial or primary offering of 2.75 million shares to be sold by STB, but the sale would dilute STB's per share earnings by *at most* $0.10 per share.

38. After the conference call and follow-up conversations described in ¶37, several investment firms issued reports on STB in which the firms rated STB and forecast its earnings based on and repeating the statements defendants made to analysts.

39. During March 1998, defendants conducted roadshow presentations in several cities, including Dallas, San Francisco and New York for potential investors. STB executives, including Ogle, participated in oral presentations using graphs and diagrams to show that strong OEM demand for STB's products had continued into 2Q98 and that STB was on track to reach revenue of $65-$70 million and $300 million in 2Q98 and FY98, respectively. Defendants also informed investors that STB would post 2Q98 and FY98 EPS of $0.32-$0.34 and $1.30, respectively.

40. On March 20, 1998, STB announced that defendants had raised $66 million via the sale of 3 million shares of STB stock at $22 per share in the public offering.

41. Beginning in the second half of April 1998, STB's problems were revealed to the public. First, two of its major OEM customers (Compaq and Dell) announced that their new generation of products would not contain any STB boards. Further, one of STB's competitors, which had won the contract with Compaq, announced that it had begun shipping a video board using SDRAM technology that worked faster and cost substantially less than STB's products. This news

began to depress STB's stock price, causing it to drop from $19-3/4 to $14-5/16 between April 14, 1998 and April 30, 1998.

42.     On May 1, 1998, STB stunned beleaguered investors, pre-announcing disastrous 2Q98 results. STB revealed that the Company expected a 30% earnings shortfall due to "pricing pressures" on its Velocity 128 and other multimedia subsystems and the rescheduling of various large orders of high-margin STB sales to Compaq. The price of STB stock reacted to these startling revelations by dropping to $10-7/8 per share, 50% below the price at which defendants had peddled $66 million worth of STB stock just five weeks earlier.

43.     Thereafter, as defendants revealed that STB's pricing and margin problems were not transitory and that Gateway 2000 would also discontinue its purchase of the Velocity 128 because of product quality problems, STB shares dropped to just $5-$6 per share. STB reported 3Q98 results which were extremely disappointing, with revenues of only $58.8 million and earnings of only $0.07 per share. STB reported only $0.14 per share for FY98, despite defendants' assertion during the Class Period that STB was on track to report $1.29+.

44.     The statements made by defendants in ¶¶34, 36-37, 39 above regarding the quality and demand for the Velocity 128, as well as its impact upon the Company's business and EPS prospects, were each false and misleading when made. The true facts, which were then actually known to defendants but which defendants intentionally concealed, included:

(a)     A substantial portion of the nVIDIA RIVA 128 chips used to power the Velocity 128 were defective, which problem could not be overcome, and thus, STB was not capable of achieving the FY98 EPS numbers disseminated by defendants.

(b)     STB was manufacturing and selling to its largest and most important OEM customers large numbers of defective products in a desperate attempt to meet demand, which practice was resulting in the return of substantial amounts of product and sky-rocketing customer dissatisfaction.

(c)     Compaq had confirmed with STB general manager Vanessa Ogle and the defendants that it was terminating its purchases of workstation graphics products because of ongoing quality problems.

- 19 -

      (d)     Sales of STB graphics boards had plunged as demand had shifted to lower priced SDRAM-based products manufactured by STB's competitors, including ATI Technologies and Matrox Graphics.

      (e)     STB's production constraints were due, in part, to the inability of nVIDIA to supply substantial amounts of operable RIVA 128 chips.

      (f)     STB's cost of sales had increased during 4Q97 in material part due to returns of defective Velocity 128 cards.

      (g)     The Velocity 128 had not been successfully introduced, but rather, was suffering from the crippling defects which caused computers in which the defective Velocity 128 was installed to crash.

      (h)     STB had **not** experienced strong market acceptance of the Velocity 128 and demand was **not** growing as certain OEM customers, including Dell, had begun to source their graphics cards from STB's competitors, including ATI Technologies, because of the design defects and quality problems with STB products.

      (i)     STB's lower-than-expected 4Q97 revenue and increased accounts receivable were due, in material part, to an unwillingness of Dell to accept and/or pay for defective STB product.

### FIRST CLAIM FOR RELIEF

#### For Violation of §10(b) of the Exchange
#### Act and Rule 10b-5 Against all Defendants

45.     Plaintiff incorporates ¶¶1-44 by reference.

46.     Each of the defendants: (a) knew the material, adverse, non-public information about STB's financial results and then-existing business conditions which was not disclosed; and (b) participated in drafting, reviewing, and/or approving the misleading statements, releases, reports, and other public representations of and about STB.

47.     During the Class Period, defendants knowingly disseminated or approved the false statements specified above which were misleading in that they contained misrepresentations and

failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of STB common stock during the Class Period.

49.    The undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed. For example:

(a)    Under Item 303 of Regulation S-K, promulgated by the SEC under the Exchange Act, there is a duty to disclose in periodic reports filed with the SEC "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results. 17 C.F.R. §229.303(a)(1)-(3) and Instruction 3. In addition to the periodic reports required under the Exchange Act, management of a public company has a duty to "make full and prompt announcements of material facts regarding the company's financial condition." SEC Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶23,120A, at 17,095, 17 C.F.R. §241.8995 (10/15/70). The SEC has repeatedly stated that the anti-fraud provisions of the federal securities laws, which are intended to ensure that the investing public is provided with "complete and accurate information about companies whose securities are publicly traded," apply to all public statements by persons speaking on behalf of publicly traded companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended

- 21 -

primary audience." SEC Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶23,120B, at 17,096, 17 C.F.R. §241.20560 (1/13/84). The SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments." *Sharon Steel Corp.*, SEC Release No. 18271, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶83,049, at 84,618 (11/19/81); and

        (b)     The NASD Manual, which governs companies whose securities are included in the NASDAQ, requires a NASDAQ company to "disclose promptly to the public through the news media any material information which would reasonably be expected to affect the value of their securities or influence investors' decisions." NASD Manual IM-4120-1.

     50.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for STB stock. Plaintiff and the Class would not have purchased STB stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

**SECOND CLAIM FOR RELIEF**

**For Violation of §20(a) of the Exchange
Act Against Defendants Ogle and STB**

     51.    Plaintiff incorporates ¶¶1-50 by reference.

     52.    Ogle acted as a controlling person of STB within the meaning of §20(a) of the Exchange Act. By reason of his positions as a director and officer of STB and/or because of his substantial stock ownership, he had the power and authority to cause STB to engage in the wrongful conduct complained of herein. STB controlled each of the Individual Defendants and all of its employees.

     53.    By reason of such wrongful conduct, STB and Ogle are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of STB common stock during the Class Period.

## CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired STB stock (the "Class") during the Class Period.  Excluded from the Class are defendants herein, members of their immediate families, any entity in which a defendant has a controlling interest, and the legal representatives, heirs, successors in interest, or assigns of any excluded party.

55.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, STB had more than 10.5 million shares of stock outstanding, owned by hundreds of shareholders.

56.     There is a well-defined community of interest in the questions of law and fact involved in this case.  The questions of law and fact common to the members of the Class which predominate  over questions which may affect individual Class members include the following:

    (a)     Whether the federal securities laws were violated by defendants;

    (b)     Whether defendants misrepresented material facts;

    (c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    (d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

    (e)     Whether the price of STB stock was artificially inflated during the Class Period; and

    (f)     The extent of damage sustained by Class members and the appropriate measure of damages.

57.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

58.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

59. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

60. The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications.

### STATUTORY SAFE HARBOR

61. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. None of the particular oral forward-looking statements pleaded herein were specifically identified as "forward-looking statements" when made. Furthermore, the statements made by defendants fail to qualify for the protection of Exchange Act §21E as they were *not* accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements. In fact, with each release detailed in ¶¶22(a), 30 and 36, the defendants included no factors at all that could cause STB's results to differ from those stated by defendants. Rather, defendants included the following *identical boilerplate* statements:

> This press release contains forward-looking statements as that term is defined in the Private Securities Litigation Reform Act of 1995. Such statements are based on management's current expectations and are subject to a number of factors and uncertainties which could cause actual results to differ materially from those described herein. [Such factors are described in] "Risk Factors" in the Company's [latest SEC filings].

In any event, each of the forward-looking statements alleged herein was authorized by an executive officer of STB, and was actually known by each of the Individual Defendants to be false when made.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B. Awarding plaintiff and the members of the Class compensatory damages, including rescissory damages, where applicable;

C. Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs;

D.       Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and federal statutory provisions sued hereunder, pursuant to Rules 64, 65, and any appropriate state law remedies; and

E.       Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED this _____ day of December, 1999.

                                            STANLEY, MANDEL & IOLA, L.L.P.
                                            MARC R. STANLEY
                                            Texas State Bar No. 19046500
                                            ROGER L. MANDEL
                                            Texas State Bar No. 12891750


                                            _____
                                            MARC R. STANLEY

                                            3100 Monticello Avenue, Suite 750
                                            Dallas, TX  75205
                                            Telephone:  214/443-4300

Of Counsel:

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
HELEN J. HODGES
California Bar No. 68581
DARREN J. ROBBINS
California Bar No. 168593
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone:  619/231-1058

LASKY & RIFKIND, LTD.
LEIGH LASKY
11 South LaSalle Street, Suite 1600
Chicago, IL  60603
Telephone:  312/634-0057

COHEN, MILSTEIN, HAUSFELD
  & TOLL, P.L.L.C.
STEVEN J. TOLL
999 Third Avenue, Suite 3600
Seattle, WA  98104
Telephone:  206/521-0080

N:\CASES\STB\DLM80838.cpt